IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STEPHEN R. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 09-289 SLR |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

David J. Lyons, Wilmington, Delaware.  Counsel for Plaintiff.

David C. Weiss and Patricia A. Stewart, of the Social Security Administration, Philadelphia, Pennsylvania.  Counsel for Defendant.  Of Counsel: Eric P. Kressman, of the Social Security Administration, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: August 23, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Stephen R. Jackson ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to reverse the decision of the administrative law judge and award his DIB benefits or, alternatively, remand the case for further proceedings. (D.I. 8) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 11) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

On March 6, 2006, plaintiff filed an application for DIB alleging disability beginning on January 1, 1997. (D.I. 5 at 105-10) Plaintiff asserted disability due to increased loss of vision. (*Id.* at 125, 148-55) Plaintiff's date last insured for DIB was December 31, 2001. (*Id.* at 116) Plaintiff's application was denied initially and on

---

[1] Under § 405(g),
[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

2

reconsideration. (*Id.* at 73, 83) Plaintiff and a vocational expert testified at a hearing held on April 29, 2008 before administrative law judge, Melvin D. Benitz ("ALJ"). (*Id.* at 24-70) On November 28, 2008, the ALJ issued an unfavorable decision, concluding that plaintiff did not have an impairment that met or equaled a listing as of his date last insured and that plaintiff had a residual functional capacity to perform light work despite suffering from open angle glaucoma. (*Id.* at 13-23) More specifically, the ALJ made the following findings:

> 1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2001.
>
> 2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 1997 through his date last insured of December 31, 2001 (20 C.F.R. § 404.1571 *et seq.*).
>
> 3. Through the date last insured, the claimant had the following severe impairment: open angle glaucoma (20 C.F.R. § 404.1521 *et seq.*).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4 (20 C.F.R. §§ 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that he would have required work that was simple, routine, unskilled and low stress due to depression and glaucoma, but would have been able to attend tasks and complete schedules; would have required jobs that had low reading and writing ability attached to them and would have required jobs that would have allowed for large image work.
>
> 6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 401.1565).
>
> 7. The claimant was born on September 3, 1947 and was 54 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant number in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 1997, the alleged onset date, through December 31, 2001, the date last insured (20 C.F.R. § 404.1520(g)).[2]

(*Id.* at 15-23) In summary, the ALJ concluded that plaintiff did not meet or equal a listing with regard to his vision impairment[3] or contraction of the peripheral visual fields[4] due to open angle glaucoma. (*Id.*) The ALJ found plaintiff's treating physicians' opinions unpersuasive because they did not offer a report dated prior to his date last

---

[2] The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

[3] Specifically, the ALJ concluded that plaintiff "never met the required visual acuity of 20/200 or less in the better eye after best correction prior to his date last insured. The last measured visual acuity prior to his date last insured was 20/30 OD and 20/60 OS in November 2001. Then in May 2002, his vision was measured as 20/40 OD and 20/100 OS." (*Id.* at 16-17)

[4] Specifically, the ALJ concluded that plaintiff "does not meet or equal listing 2.03 with regard to contraction of the peripheral visual fields in the better eye to 10 degrees or less from the point of fixation; so the widest diameter subtends an angle no greater than 20 degrees or to 20 percent or less visual field efficiency. The medical evidence of record from Dr. Fallin and Dr. Fox does not establish that the claimant had a contraction of the peripheral visual fields that meets or equals this listing; and those records are the only records in evidence prior to the claimant's date last insured." (*Id.* at 17)

insured indicating that he was legally blind. (*Id.* at 17) The treating physicians merely speculated that plaintiff was legally blind prior to his date last insured, and their opinions were rendered during the claimant's process of applying for disability insurance benefits. (*Id.*) On December 9, 2008, plaintiff appealed the ALJ's decision to the Appeals Council who declined to review the decision, making it a final decision reviewable by this court. (*Id.* at 1-3, 8-9) Plaintiff filed the present action on April 24, 2009. (D.I. 1)

### B. Documentary Evidence

Plaintiff claimed disability, starting in January 1997, due to glaucoma. (D.I. 5 at 130) Dr. Laura Fox diagnosed plaintiff with glaucoma when she examined him in May 1997. (*Id.* at 188-90) The medical records indicate that plaintiff's vision at the time was 20/70 in the right eye and 20/20 in the left eye with overall visual acuity of 20/20. (*Id.*) In September and November of 1998, plaintiff saw Dr. Robert Abel, Jr. for his condition, but no records were available from those visits. (*Id.* at 187) Plaintiff visited Dr. H. Kirk Fallin in November 2001 to address problems with clarity in his left eye. (*Id.* at 184) On his intake form, plaintiff reported no problems with his right eye and did not specifically mention having difficulty reading. (*Id.*) In fact, he listed his occupation as "Author/Seminars" and wrote that his hobbies included films, reading and art. (*Id.*) Dr. Fallin diagnosed plaintiff with glaucoma, but with correction, plaintiff had 20/30 vision in the right eye and 20/60 vision in the left eye. (*Id.* at 185)

In May 2002, Dr. Lawrence Jindra diagnosed plaintiff with glaucoma and measured his visual acuity at 20/40 in the right eye and 20/100 in the left eye. (*Id.* at

226) Dr. Jindra informed plaintiff that he needed to undergo a traditional surgical trabeculectomy due to the advanced stage of his glaucoma. (*Id.* at 209) Based on the results of plaintiff's visual field test and the restricted angles of his vision, Dr. Jindra told plaintiff that he was legally blind and would qualify for Medicare through social security to cover the cost of the surgery. (*Id.*) Plaintiff instead opted for a selective laser trabeculoplasty, which failed to sufficiently lower his intraocular pressure given the extremely deteriorated condition of his optic nerves in both eyes. (*Id.*)

On March 12, 2006, plaintiff completed a disability report (*Id.* at 129), work history report (*Id.* at 137), and work activity report (*Id.* at 125). On April 13, 2006, plaintiff completed a pain questionnaire (*Id.* at 146) and a function report (*Id.* at 148). In these various forms, plaintiff indicated that he stopped working on February 26, 2006 due to his condition. (*Id.* at 130) He listed his occupation as "books and seminars," but said he has difficulty completing writing projects due to his vision loss. (*Id.* at 125-27, 153) Plaintiff is capable of sitting and can walk about two miles before stopping. (*Id.*) He requires the use of contacts or glasses at all times. (*Id.* at 154) He passed an eye test at the Department of Motor Vehicles in September 2005, although he was restricted to daytime driving and acknowledged that he finds it dangerous to drive. (*Id.* at 127) Additionally, plaintiff claims that he suffers from depression and loses sleep at night due to his fear of losing his vision completely. (*Id.* at 149, 154) He cannot afford to see a psychiatrist or take prescription medications for his depression, but he treats himself using his training in psychology. (*Id.* at 149, 155)

Plaintifff's responses to the questionnaires also provide a depiction of his daily

6

life. (*Id.* at 148-55) Plaintiff lives with and cares for his aunt, who suffers from dementia. (*Id.* at 148) Plaintiff wakes up at 8 a.m. every morning to prepare breakfast for his aunt. (*Id.*) He exercises, showers, and begins writing at 9 a.m. (*Id.*) At noon, he takes a break to eat lunch and feed his aunt. (*Id.*) From 1 p.m. to 5 p.m., he writes and takes phone calls. (*Id.*) At 5 p.m. plaintiff makes dinner for himself and his aunt. (*Id.*) Plaintiff finds it difficult to watch television due to his vision loss, but he watches movies occasionally and listens to the radio. (*Id.*) Plaintiff does not report having problems with his own personal care. (*Id.* at 149) With respect to chores and cleaning, plaintiff reported that he walks to the grocery store about three times a week, cooks meals for himself and his aunt daily, and maintains his aunt's condominium. (*Id.* at 150) Plaintiff's license allows him to drive during the day, but he reports driving only when absolutely necessary to go to the grocery store. (*Id.* at 151) He relies on friends to pick him up and drop him off to participate in social activities. (*Id.* at 152-53) Generally, he leaves the house approximately once a day and reports that he can go outside alone. (*Id.*)

Plaintiff first consulted with Dr. Heather Dealy on August 8, 2006 to obtain a traditional surgical trabeculectomy. (*Id.* at 208) At the first examination, Dr. Dealy found that plaintiff had 20/200 visual acuity in both eyes at distance, and she diagnosed severe glaucomatous optic atrophy in both eyes. (*Id.* at 199, 208) Dr. Dealy performed a surgical trabeculectomy with an adjunctive mitomycin C in his left eye and an adjunctive 5-Flurouracil in his right eye to preserve his remaining vision. (*Id.* at 207)

On August 23, 2006, Dr. Michael H. Borek, a state agency physician, determined

that plaintiff's condition was not disabling prior to the date last insured based on the medical evidence received and the evidence was insufficient to assess the extent of plaintiff's vision impairment prior to his date last insured. (*Id.* at 191-92) On October 31, 2006, Dr. Vinod K. Kataria, a state agency physician, reviewed the evidence of record and affirmed the findings made by Dr. Borek. (*Id.* at 197)

### C. Hearing Before ALJ

#### 1. Plaintiff's testimony

At the hearing, plaintiff testified that his medical problems began in 1985 and prevented him from continuing his work as a therapist by 1997. (D.I. 5 at 30, 50) In 1997, plaintiff started a company called Set for Life Seminars and gave seminars until he was no longer able to read his notes in 2001. (*Id.* at 37-38, 51) Plaintiff has since written a couple of books by using dictation and large computer fonts. (*Id.* at 38-39, 53) In February of 1998, plaintiff moved in to care for his aunt, who suffers from dementia. (*Id.* at 30) His duties included ensuring that his aunt did not wander off, grocery shopping, cooking and cleaning. (*Id.* at 51) Plaintiff continues to care for his aunt but, by about 2001, he was no longer able to clean the house and needed assistance with grocery shopping and cooking. (*Id.* at 40-42, 52) By December 2000, he stopped driving due to blind spots in his vision. (*Id.* at 34-35) Plaintiff testified that he has struggled with depression as a result of his worsening eyesight and the prospect of going completely blind. (*Id.* at 53-54) When he was first diagnosed with glaucoma, he planned to commit suicide if he went blind. (*Id.*) He testified that he saw Dr. David Hart several times for his depression in 1996 or 1997, and he no longer has suicidal

thoughts. (*Id.* at 54)

Plaintiff also testified about his medical history at the hearing. Specifically, plaintiff testified that he was first diagnosed with advanced glaucoma by Dr. James Castner in 1985 after noticing some vision problems. (*Id.* at 30-31) He was treated by Dr. Castner and Dr. Sherry Roth, a glaucoma specialist, from 1985 to 1997. (*Id.* at 31) He suffered from a detached retina in 1987 and had surgery to repair it. (*Id.*) In 1990 and 1991, plaintiff had Argon laser treatment surgery on both of his eyes to relieve pressure. (*Id.*) Plaintiff saw Dr. Laura Fox for a short period in 1997 and 1998, and he visited Dr. Abel from 1998 to 2000. (*Id.* at 33) From 2000 to 2001, plaintiff underwent herbal treatments. (*Id.*) Plaintiff saw Dr. H. Kirk Fallin in November 2001 and was informed that his optic nerves were severely damaged. (*Id.* at 34)

Beginning in 2002, plaintiff began to see Dr. Lawrence Jindra, who specializes in selective laser trabeculoplasty. (*Id.* at 42) Dr. Jindra encouraged plaintiff to apply for Medicare to pay for a traditional surgical trabeculectomy due to the advanced stage of plaintiff's disease, but plaintiff declined and requested the laser treatment instead. (*Id.*) The laser treatment temporarily relieved the pressure in plaintiff's eyes, but the pressure returned and Dr. Jindra advised plaintiff that he would have to undergo a traditional surgical trabeculectomy. (*Id.* at 43) Plaintiff underwent surgical trabeculectomies in both eyes in August of 2006 under the care of Dr. Heather Dealy. (*Id.* at 44)

### 2. Vocational expert testimony

After the vocational expert discussed plaintiff's past relevant work, the ALJ asked the vocational expert, Mr. Mitchell Schmidt, to assume a hypothetical individual with plaintiff's vocational characteristics and give an opinion as to whether such a hypothetical individual could perform a significant number of jobs in the economy. (D.I. 5 at 58-59) The following exchange occurred between the ALJ, vocational expert and plaintiff:

> ALJ: I'd like for you to assume a hypothetical if you would, Mr. Schmidt, of a person who's 49 years of age on the onset date, has a PhD in psych, past relevant work as just indicated.

At this juncture, the ALJ elicited from plaintiff that he is right handed. (*Id.* at 59) The ALJ continued:

> ALJ: Suffering mostly and generally during the period in question from what's been termed open angular glaucoma. He indicates from his testimony here today that he did have some mild depression associated with his condition, but seems to be improving from that point. And if I find, Mr. Schmidt, that he needed simple routine and unskilled jobs, low stress due to his situation during the period in question, due to his mild depression and his glaucoma, was able to attend to task and complete schedules, lift 10 pounds occasionally, or frequently, 20 on occasion, could sit and stand for four hours each, and he would have to have jobs that would have little reading or writing ability attached to them due to his glaucoma, jobs that would allow large image at work, with those limitations would be able to do light work activity. Are there jobs that would have existed in the period in question in significant numbers in your opinion as a Vocational Expert that such a person could do?

(*Id.*) The vocational expert testified that such a hypothetical individual could perform a significant number of unskilled, sedentary jobs in the national and regional economies. (*Id.* at 59-60) These jobs included recreation aid, ticket taker, and garment sorter. (*Id.*)

The vocational expert acknowledged that plaintiff would not be able to do any of his past work pursuant to the criteria contained in the *Dictionary of Occupational Titles*. (*Id.* at 60)

On examination by plaintiff's attorney, the vocational expert indicated that a recreation aid's duties include checking people's identification cards and might involve reading small print. (*Id.* at 61) However, the vocational expert noted that a recreation aid's duties fit within the ALJ's hypothetical pursuant to the *Selected Characteristics of Occupations* defined in the *Dictionary of Occupational Titles* because the job does not require near visual acuity, far visual acuity, depth perception, color vision or discrimination, or field of vision. (*Id.* at 62) Further, the vocational expert testified that although the garment sorter and ticket taker positions require frequent near visual acuity, the positions fit within the scope of the ALJ's hypothetical because they have no reading or field of vision requirements pursuant to the *Selected Characteristics of Occupations* defined in the *Dictionary of Occupational Titles*. (*Id.* at 64-65)

## III. STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the

Commissioner's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence

12

but mere conclusion." *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

## IV. DISCUSSION

### A. Disability Determination Process

Within the meaning of social security law, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." 20 C.F.R. §§ 404.1505, 416.905. The claimant bears the initial burden of proving disability. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Podeworthy v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984). To qualify for disability insurance benefits, the claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of

non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[5] *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(d).[6]

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's

---

[5] Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii).

[6] Prior to step four, the Commissioner must assess the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

14

impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC.]" *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted. *Id.*

### B. Whether the ALJ's Decision is Supported by Substantial Evidence

On appeal, plaintiff presents two primary arguments: (1) that the ALJ erred in finding that plaintiff failed to prove that he met the listed impairment for legal blindness prior to the plaintiff's date last insured; and (2) that the ALJ misconstrued, disregarded, or failed to reconcile the opinions of plaintiff's treating physicians in rendering his decision. (D.I. 9 at 9-10)

#### 1. Listing of impairments

In his decision, the ALJ discussed the listings he deemed applicable to plaintiff's case and determined that plaintiff's impairments did not meet those listings. (D.I. 5 at 16-17) As previously discussed, plaintiff's visual acuity one month prior to the date last insured was 20/30 in his right eye and 20/60 in his left eye, which the ALJ found to be well below the listing requirement of 20/200 in the better eye after best correction. (*Id.*)

Likewise, the ALJ determined that the medical evidence dated prior to the date last insured from Dr. Fallin and Dr. Fox did not establish that the claimant had a contraction of the peripheral visual fields or a visual efficiency that met or equaled the listings. (*Id.* at 17) The ALJ explained that he did not consider the opinions of Dr. Jindra and Dr. Dealy because they were not rendered prior to plaintiff's date last insured and they merely speculated that plaintiff was legally blind during the relevant time period based on a review of the medical report issued by Dr. Fallin. (*Id.*)

Plaintiff argues that the reports of Dr. Jindra and Dr. Dealy clearly indicate that plaintiff met the requisite listings, and the ALJ did not provide sufficient reasoning for failing to consider their reports. (D.I. 9 at 10-12) Citing *Mendes v. Barnhart*, 105 Fed. Appx. 347 (3d Cir. 2004), plaintiff posits that medical reports need not be dated prior to the date last insured to be considered as evidence that plaintiff meets the listings. (D.I. 9 at 11) Defendant responds that no contemporaneous medical records prove that, as of plaintiff's date last insured, plaintiff met the definition of statutory blindness under any of the applicable listings. (D.I. 12 at 12-13) To the contrary, defendant notes that Dr. Fallin's examination of plaintiff one month prior to his date last insured revealed that plaintiff was not statutorily blind. (*Id.* at 13) Given the ALJ's consideration of the medical evidence from the period immediately prior to plaintiff's date last insured, substantial evidence exists to support the ALJ's determination that plaintiff was not legally blind prior to his date last insured.

## 2. Treating physicians' opinions

To determine a treating source opinion's weight, the ALJ must weigh all evidence and resolve any material conflicts.[7] See *Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Fargnoli*, 247 F.3d at 43 (recognizing that the ALJ may weigh the credibility of the evidence). The regulations generally provide that more weight is given to treating source opinions; however, this enhanced weight is not automatic. See 20 C.F.R. § 404.1527(d)(2). Treating source opinions are entitled to greater weight when they are supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with "other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); see *Fargnoli*, 247 F.3d at 43. "Although a treating physician's opinion is entitled to great weight, a treating physician's statement that a plaintiff is unable to work or is disabled is not dispositive." *Perry v. Astrue*, 515 F. Supp. 2d 453, 462 (D. Del. 2007). The ALJ may discount the opinions of treating physicians if they are not supported by the medical evidence, provided that the ALJ adequately explains his or her reasons for rejecting the opinions. See *Fargnoli*, 247 F.3d at 42. When a treating physician's opinion conflicts with a non-treating physician's opinion, the Commissioner, with good reason, may choose which opinion to credit. See *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

---

[7] The court notes that the ALJ's review and determination of weight for a treating physician's opinion is not unlimited. "In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (citing *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)).

If a treating opinion is deemed not controlling, the ALJ uses six enumerated factors to determine its appropriate weight. See 20 C.F.R. § 404.1527(d)(2-6). The factors are: (1) length of the treatment relationship; (2) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. See id. The supportability factor provides that "[t]he better an explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion." 20 C.F.R. § 404.1527(d)(3). Similarly, the consistency factor states that the "more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 404.1527(d)(4). In the case at bar, plaintiff claims that a doctor's opinion is sufficient if it establishes a "reasonable medical probability" under Mendes. (D.I. 9 at 14) Defendant responds that the ALJ rightfully gave more weight to the clinical findings of Dr. Fox and Dr. Fallin than to the equivocal, retrospective opinions by Dr. Jindra and Dr. Dealy. (D.I. 12 at 13)

Substantial evidence supports the ALJ's determination that the opinions of Dr. Jindra and Dr. Dealy are not entitled to controlling weight. The ALJ expressly addressed the opinions of Dr. Jindra and Dr. Dealy and gave them only limited weight because they rendered their opinions based on the review of medical records from other doctors who treated plaintiff prior to the date last insured. (D.I. 5 at 20) Further, the ALJ concluded that the physicians' opinions contained speculative statements which were unsupported by a review of plaintiff's medical records dated prior to the date last insured. (Id.)

18

## V. CONCLUSION

For the reasons stated above, the ALJ's decision is supported by substantial evidence. Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. An appropriate order shall issue.